Ellis & Morton *vs.* The Ohio Life Insurance & Trust Co.

Special Term—June 1854.

STORER, J. presiding.

A party, who pays a check or draft drawn upon him, is estopped from denying the genuineness of the drawer's signature.

The only exception to this rule is: when the party, who holds the check or draft, has been guilty of fraud; or such gross negligence as would be equivalent to fraud.

When payment of a forged bill or check is once made by the drawee, the party, to whom the payment was made, is entitled to notice of its invalidity the same as the endorser of a bill of exchange.

The plaintiffs are bankers and brokers, and the defendants are bankers, in Cincinnati. In this action a recovery is sought upon the following facts: On the fourteenth day of December, 1852, the defendants presented at the counter of the plaintiffs, for payment, a check for seven thousand five hundred dollars ($7500,) purporting to be drawn upon the plaintiffs by the mercantile house of Evans & Swift; that firm kept a large deposit with the plaintiffs, and at that time, a much larger sum than the amount of the check was at their credit on the plaintiffs' books: the check was paid to the defendants, and the same day the amount was charged up to Evans & Swift. On the 23d of the same month, the account of Evans & Swift was discovered to be overdrawn, and their bank book sent for to

13

be adjusted. The next day, Mr. Evans called at the plaintiffs' banking house, and on examining the checks charged to Evans & Swift, discovered that the check paid to the defendants on the 14th was a forgery. The plaintiffs immediately informed the defendants of the fact, and demanded that the amount should be refunded. This was declined. It was also in evidence, that the check in controversy, with some others, making in the aggregate $10,000, and all drawn upon the plaintiffs, was presented for payment between 10 and 12 o'clock in the forenoon of the 14th December; that the checks were pinned together and attached to a memorandum or ticket, made out at the office of the defendants, stating the several amounts in figures only; that when the checks were paid, they were not examined, but the payment was made of the amounts as stated on the ticket. In the afternoon of the same day, the checks were severally charged up to the parties by whom they purported to have been drawn, and then laid away. It was further in proof, that the business relations between the parties, were somewhat different from those which existed between the defendants and the other bankers of the city. Between these parties a rule had been established, that the checks taken by either should be redeemed in cash, with the understanding between them, if any mistake occurred in the payment of checks during the hurry of business, it might be corrected on the same day. It was also in evidence, that on the morning of the 14th, the check referred to, with another for a similar amount, was presented at the defendants' office by a person in the dress of a drover, with a request that the defendants should purchase it, and pay in Kentucky funds or gold. The paying teller, to whom the application was

made, referred the matter to the cashier, who, after having seen the checks, decided that they should be purchased, and they were accordingly cashed; gold at a small premium being given in return.

The paying and receiving tellers of the Trust Co. both testified, that the checks of parties upon other banks were often received from strangers in payment of exchange or the purchase of gold, a large amount of which was then in the vaults of the company; that the transaction was in the usual course of business, and there was nothing in it to excite suspicion or distrust. The paying teller further said, that he saw nothing in the manner or appearance of the person, who presented the checks, to excite his suspicions; that he was a stranger; but checks to large amounts were frequently presented by drovers and paid without any hesitation, unless there was some fact out of the ordinary course, to put the officers of the bank on their guard. It was also in evidence, that when the check was cashed by the defendants, it was in the middle of what is called the pork season; that the drawers of both checks were large purchasers of produce, and their checks for large sums were given in the course of their business. It was further in proof, that Evans & Swift had kept their cash with the plaintiffs for seven or eight years, and the average balance to their credit would be $15,000 or $20,000.

No general usage by the bankers of the city as to the purchase of checks was proved; the witnesses all uniting in the opinion, that every bank and banker pursued his own course, exercising at the time the best judgment in every such matter. Several witnesses, who were tellers and clerks of banks, testified that they would not, as a general rule, take so large a check upon another bank,

unless some reference was given, or they were satisfied the check would be paid, by inquiry; this, however, is limited by some, to those checks that are made payable to order; others make no distinction. Other witnesses, one of whom is among the oldest cashiers in the city, stated that in all cases there is a discretion to be used, and unless there is something in the form or manner of the application, or the check itself, that excites suspicion, if they were satisfied of the ability of the drawer, and had no reason to doubt his signature, they would not hesitate to purchase or receive the check.

All the evidence before the jury was that which was offered by the plaintiffs; the defendants introduced none. The testimony offered was admitted subject to every proper exception, both to its competency and relevancy.

A non-suit was asked by the defendants' counsel, who contend, that the plaintiffs have made out no such case as will entitle them to recover. They insist:

*First.* That the party, who accepts a bill of exchange, or pays a check or draft drawn upon him, is estopped from denying the genuineness of the drawer's signature.

*Second.* That the only exception to the rule is, when the party who holds the bill, check, or draft, has been guilty of fraud, or such gross negligence as would be equivalent to fraud; in other words, that the holder must be held, actually or constructively, to be a participant in the act by which the drawee has been made liable to payment, or subjected to loss, and there is no such evidence of *mala fides* in the transaction on the part of the defendants.

*Third.* That when payment of a forged bill or check, is once made by the drawee, the party to whom the pay ment was made is entitled to notice of its invalidity, the

same as the indorser of a bill of exchange; and that such notice, in a case like the present, must be given on the same day that the payment was made; that the drawee, on that day, was bound to examine all such checks, bills, and drafts, and to notify the former holder if any error or mistake has been made in their payment; that the duty to thus examine, if not performed, is an act of omission, equivalent to an adoption of the check, and a discharge of the person who presented it and received the amount.

*Fourth.* That no general usage or custom among banks or bankers, in relation to the purchase or receipt of checks or money drawn on other banks or bankers, can be received in evidence, but testimony may be given as to the particular usage and understanding that existed between the plaintiffs and defendants, in relation to their daily business, and upon which they mutually acted.

The plaintiffs do not deny the general principles of law, as to the effect of an acceptance or payment of a forged bill, but contend that the present case is an exception to the rule; that the peculiar circumstances connected with it, necessarily exclude it from the operation of that rule.

They claim:

*First.* That money paid under a mistake of the fact, or where there is misrepresentation, fraudulent pretence, or concealment, may be recovered back by the payer.

*Second.* That when payment, by the drawee of a forged check, does not work an injury to the holder of the check, such payment does not estop the payer from proving the forgery; and, as in this case, the holders of the check must have lost their remedy upon the person who sold it, as he was a stranger, so soon as they had paid him the money, that their condition is not changed by the receipt

of the money from the drawees; and in such a case, notice of the forgery, as would be required in other cases, need not be given; for it would be a vain thing, and the law requires no such act to be done.

*Third.* That the numbers and amounts of the checks, stated on the ticket sent by the defendants to the plaintiffs, were a guarantee that they were such checks, and if paid by the plaintiffs, they can compel the defendants to refund. The plaintiffs' counsel also contend that there is a distinction in the books, between the notice required to be given to the guarantor, and that which is required to be given to an endorser.

*Fourth.* That when the fault, that caused the loss, can be traced to either party, there the loss must fall.

*Fifth.* That the check or draft must have been purchased or received in the usual course of business, in good faith and without suspicion.

*Sixth.* That here there is a total failure of consideration, and the amount paid cannot *ex æquo et bona* be retained by the defendants.

*Seventh.* That there are questions of fact before the jury, that they alone are competent to try, and the case cannot properly be taken from that tribunal.

STORER, J.

The last proposition, if true, must decide the present motion. Let us examine it.

A motion to arrest the evidence in any case from the jury, and to grant a non-suit, necessarily assumes the fact that upon the case as presented, there can be no recovery by the plaintiffs.

There is an admission, also, that the testimony offered

by the plaintiffs is true, and taking it as true, there is no ground to sustain the action.

If there is doubt as to the facts proved; if the credibility of witnesses is called in question; if there is a dispute as to any material part of the testimony, a jury is the proper tribunal to decide the controversy; but where, as upon a demurrer to evidence, all the matters in evidence are held to be fully proved, and the only real question can be the application of the law to those facts, it is not only within the power, but it is the duty, of the Court, to take the responsibility, and direct or refuse a non-suit, as in their judgment shall be right and proper.

At this period in our judicial history, the power to grant a non-suit cannot be seriously questioned; it is a part of the machinery by which justice is administered, and without whose existence parties would be involved in useless, it may be said, endless, litigation. Whenever a court is fully satisfied that the action does not lie, and that even if a verdict should be found for the plaintiff, it could not be sustained, they ought to interfere. The plaintiff having offered all his testimony, it is for the court to decide what effect is to be given to it, and what the law is that controls it. And in a case where all the facts are admitted, there can be nothing left for the jury to decide, if the law of the case is at last to determine the controversy.

We find nothing in the present case, to prevent a full exposition of the law as applicable to the rights of the several parties; and upon what that law is found to be, the controversy must be determined. This has been the invariable practice in Ohio:

Slipher *vs.* Fisher et al. 11 *Ohio*, 299; Powell *vs.* Jones, 12 *Ohio Rep.* 35.

What, then, is the law upon the facts proved in this case?

Since the case of Price *vs.* Neal, (3 *Burrows*, 1355,) decided by Lord Mansfield in 1762, it has uniformly been held in England, that the acceptor of a bill, by the very act of acceptance, admits the genuineness of the drawer's signature, and will not, as a general rule, be permitted to dispute it in the hands of a *bona fide* holder for value, without notice of any fraud; and if the bill is paid by the drawee, he is precluded from recovering back the money, on the mere allegation that the drawer's name was forged. The principle thus asserted was but the recognition of the ruling of Chief Justice Pratt, in Wilkinson *vs.* Lutwidge, (1 *Strange*, 648,) and in Jenys *vs.* Fowler, (2 *Strange*, 946.) It is now the settled law in Great Britain.

*Bayley on Bills*, 5*th Ed. ch.* 8, *pp.* 318, 319; *Chitty on Bills*, 11*th Am. Ed.* 307; Smith *vs.* Chester, 1 *T. R.* 655; Bass *vs.* Clive, 4 *M. & S.* 15; Smith *vs.* Mercer, 6 *Taunton*, 76; Wilkinson *vs.* Johnson, 3 *B. & C.* 428; Cocks *vs.* Masterman, 9 *B. & C.* 902.

The American courts have, without an exception, adopted the principle, and it may now be regarded as the law of the land.

Levy *vs.* Bank U. S. 1 *Binney*, 27; Bank U. S. *vs.* Bank of the State of Georgia, 10 *Wheat.* 333; Salem Bank *vs.* Gloucester Bank, 17 *Mass.* 33; Bank of St. Albans *vs.* F. & M. Bank, 10 *Verm.* 141; Bank of Commerce *vs.* Union Bank, 3 *Comstock*, 230; Goddard *vs.* Merchants' Bank, 4 *Comstock*, 149; Marsh et al. *vs.* Small et al. 3 *Louisa Rep.* 402; *Story on Bills*, § 262; *Story on Prom. Notes*, § 197; *Parsons on Contracts*, § 220.

The reason of the rule thus established is, that by his acceptance the drawee has given currency to the bill; on the faith of that acceptance, it may have been afterwards negotiated, and become a representative of important commercial transactions. If, then, after performing the function of a genuine bill, having been the means of credit, and been made a substitute for cash, it could be afterwards dishonored by the acceptor, every sound principle of the law merchant would be violated, and the foundation of mercantile confidence fatally impaired.

The drawee is supposed to know the signature of the drawer. He is generally his correspondent, and in the mutual interchange of business relations, no want of knowledge on the part of either, as to their duties or liabilities, will be presumed. And when the drawee is a banker who is accustomed daily to examine and honor the checks of his depositors, and must thereby have become familiar with their signatures, the rule applies with very great force. The plaintiffs do not deny the existence of the rule, nor its universal acceptance as the established law; they only contend that the present case is an exception to its application.

It is admitted by the defendants, that the holder of the bill must have obtained it in good faith, for value, and without notice of the fraud, before they can claim to be protected. For the plaintiffs it is assumed, that the holders should be guilty of no neglect in taking the bill; if they have been imprudent or unguarded, if they have purchased it incautiously, even, they ought to be held liable to refund.

What is the true rule, however, presents another question. It ought not to depend upon mere opinion, or tem-

porary usage, or what may be adjudged, under all the circumstances, to be the equity of the case ; the determination of legal questions should not rest upon any thing vague or indefinite in the application of established rules. It is not the application of the rule in any particular case, but rather its reason, propriety, and general acceptance, that must be regarded ; whether it may operate liberally, or perchance severely, is not a question for the court. Whenever the rule is ascertained, and has met the acceptance of the profession as established law, it is the duty of the judge to preserve its integrity, and permit no modification, to meet the exigency of any particular case.

How, then, is the holder of a bill to be protected ?    I reply, that he must have taken it in the usual course of business, paid a full consideration for it, and received it in good faith, without actual or constructive knowledge of any fraud on the part of the person from whom it is received. The mere neglect of the holder of every possible or supposed means to ascertain the genuineness of the bill before he purchases it, is not evidence of bad faith ; for until suspicion is excited, there can be no necessity for inquiry, and to question the right of the party who offers the bill for sale, before any doubts are raised as to its validity, would defeat the established maxim that every bill of exchange upon its face imports to be genuine, and implies a consideration either paid to or received by the drawer, from the drawee.

There has been, until the last thirty years, much diversity of opinion as to the degree of prudence to be exercised by the purchaser of a bill, the omission of which would charge him with notice of the equities of the parties, but it is believed there is now no doubt as to what is the true rule.

Until the case of Gill *vs*. Cubit et al. was decided, in 1824, by Chief Justice Abbot (3 *B. & C.* 466,) it was held that the holder took the bill, freed from all equities, except those of which he had actual or constructive notice; and the question of neglect or omission to do what the strictest prudence might suggest, neither created, nor did it charge the purchaser with any liability for latent fraud. But in the case just referred to, without any notice to the profession, and, as it would seem, uncalled for by the commercial world, a new rule was introduced, "the court holding, for the first time, that if the bill was taken by the plaintiffs under circumstances which ought to have excited the suspicion of a prudent, careful man, the verdict should be for the acceptor." This decision virtually overruled the authority of Lawson et al. *vs*. Weston et al. (4 *Esp.* 56,) decided by Lord Kenyon in 1801, and established a new, and what was found to be, a very flexible and uncertain rule. In Down *vs*. Halling, (4 *B. & C.* 330,) decided in 1825, the law in Gill *vs*. Cubit was admitted; it was recognized in Snow *vs*. Peacock, (2 *Carr & Payne* 215,) and in Beckwith *vs*. Correl, (2 *Carr & P.* 261.) In Slater et al. *vs*. West, (3 *C. & P.* 325,) Lord Tenterden held the law to be as he had decided, while Chief Justice Abbot, in Gill *vs*. Cubit. "This doctrine," he says, "is of modern origin. I believe that I was the first judge who decided the point at *nisi prius*; the court to which I belong confirmed my decision, and the other courts, I believe, have acted on the same principle. But in every case of this description the question is one, which ought to be guardedly and carefully considered."

The English courts were governed by the rule thus laid down, until the case of Crook *vs*. Jaddis, in 1833, (5 *B.*

*&* *A.* 911,) when it was held by Chief Justice Denman, Littledale, Taunton, and Patterson, Justices, "that gross negligence should be proved on the part of the purchaser of the bill, or he must recover against the acceptor." "I use," says the Chief Justice, "the expression, gross negligence, advisedly; and Taunton, J. said, "I cannot estimate the degree of care that a prudent man should take; the term gross negligence is more definite and appropriate." This case came under consideration in Blackburn *vs.* Harrison (5 *B.* *&* *A.* 1106,) and was fully confirmed. Patterson, J. in giving his opinion, observed, "I have no hesitation in saying, that the doctrine first laid down in Gill *vs.* Cubit et al. and acted on in the other cases, goes too far and ought to be restricted. I can perfectly understand, that a party who takes a bill fraudulently, or under such circumstances that he must know that the person offering it to him has no right to it, will acquire no title; but I never could understand that a party, who takes a bill *bona fide*, but under the circumstances mentioned in Gill *vs.* Cubit et al. did not acquire a property in it."

In Branch *vs.* Roberts, (1 *Bingham*, *N. C.* 469,) though the question mooted was upon the pleadings, the authority of the last case was fully sustained. The question was again considered in Goodman *vs.* Harvey et al. (4 *Ad.* *&* *Ell.* 870,) and all the prior decisions were examined. Lord Denman, in deciding it, said, "I believe we are all of opinion that when the party has given consideration for the bill, gross negligence would not be a sufficient answer to a recovery. It may be evidence of *mala fides*, but it is not the same thing. We have shaken off the last remnant of the contrary doctrine. When the bill has passed to the plaintiff, without any proof of bad faith in him, there is

no objection to his title." The case was affirmed in Uther *vs*. Rich, (10 *Ad. & Ell.* 784; see also Foster *vs*. Pearson, 1 *Crompton & Ros. Ex. Rep.* 855, and Arbouin *vs*. Anderson, 1 *Ad. & Ell. N. S.* 645,) where it is said, " that the owner of a bill is entitled to recover upon it, if he came by it honestly; that fact is implied *prima facie* by possession."

In *Chitty on Bills*, 9 *Eng. Ed.* 216, it is stated as the result of all the authorities, that "it is not .enough to deprive a holder for value of his remedy on the bill, to show that he was guilty of gross negligence, unless it also appears that he acted *mala fides;* and again, at page 217, "The doctrine of Lord Tenterden is now completely exploded, and the old rule of law that the holder of bills of exchange endorsed in blank, or other negotiable securities transferable by delivery, can give a title, which he does not himself possess, to a person taking them *bona fide* for value, again re-established in its fullest extent."

Such is the law as it now exists in England, and the American cases but reiterate the rule. In his treatise on Bills of Exchange, § 416, Judge Story says, " The reasonable doctrine now established is, that nothing short of fraud, not even gross negligence, if unattended with *mala fides*, will take away the right of a *bona fide* holder of the bill; " and in § 194, he further states, " The former doctrine has been overruled and abandoned."

See, also, *Story on Prom. Notes*, § 178, § 197. *Parsons on Con. vol.* 1, *p.* 213. 10 *Verm.* 147; 3 *Louisa. Rep.* 402; 4 *Comstock*, 147; 3 do. 230; 1 *Hill*, 287, before quoted; Cone *vs*. Baldwin, 12 *Pick.* 545; Wheeler *vs*. Guild, 20 do. 545.

The law as thus interpreted, cannot at this time be

questioned, and it is adopted by the court, as the only proper rule that should govern the commercial community. We hold that unless the defendants in this suit have been proved to be complicated with the fraud by which the plaintiffs have suffered, they cannot be held to refund the amount that has been paid to them.

Does the evidence sustain this assumption? The check was purchased in the regular course of business; there was nothing in the manner of its presentment, the appearance of the holder, or the nature of the transaction to excite suspicion. The officers of the Trust Company testify they saw nothing to induce any particular inquiry as to the title of the holder; his demeanor and apparent calling were such as to disarm suspicion; the drawers of the check were perfectly solvent, and their signature was not doubted.

There was then nothing to put the officers of the bank upon inquiry: but if from abundant caution the cashier or teller should nevertheless have sent to the plaintiffs' banking house, to ascertain if the check would be paid, the answer must have been that the drawers had ample funds to their credit; and is it not probable, from the fact that the drawees never discovered the forgery themselves, that they would have certified the check to have been valid? It is in proof, that the signature of the drawers was well imitated, though the body of the check was a failure; but as checks are not always filled up by the drawers, there was nothing in that fact to excite doubt.

It is further urged, that a check for so large an amount should not have been taken without inquiry, and a usage is attempted to be proved, that in some of the banks in Cincinnati such a course is always adopted. The proof, however, is unsatisfactory, even as to any individual bank

or banker. The result of the whole evidence is, that there is no general usage, that each bank is governed by its own rule, an honest discretion being exercised in the purchase of bills and checks, as the peculiar circumstances of each case may suggest.

But if a special usage with one or more banks existed, it could not avail; the usage, to affect the defendants, should have been general. In the late case of Adams *vs*. Otterback, (15 *How*, 545,) Judge McLean very clearly lays down the true rule, "To constitute a usage it must apply to a place, rather than to a particular bank. It must be the rule of all the banks of the place, or it cannot consistently be called a usage. If every bank could establish its own usage, the confusion and uncertainty would greatly exceed any local convenience resulting from the arrangement."

An examination of the cases, however, already quoted, will exhibit objections much stronger than the fact that is pressed upon the court, of the large amount of the check; yet these objections were all overruled and held insufficient to excite suspicion, or to lead to inquiry. We hold the true test of good faith to be, what should have been done at the time the transaction took place, when no suspicion existed and there were no obvious difficulties to avoid; not what *might* have been done, or what, after the fraud is accomplished, a more rigorous caution would have indicated. We must not determine the degree of prudence, by any other standard than would have governed honest men in their ordinary pursuits; nor can we, with the new light we may have obtained from the discovery of a fraud, decide that any precautions other than those that were used could have prevented its perpetration. It would be an

unsafe and certainly a most uncertain rule, to permit mere opinion to give a character to a past transaction, when its consequences have been injurious; such an opinion is too often produced by reflecting upon the act done, and the probable means by which it could have been avoided; when perhaps the witness who expresses it, would, if he had been present when the fraud was perpetrated, have pursued the same course that he indirectly censures.

We have said, that the evidence of *mala fides* need not be such as would charge the purchaser of the bill with actual notice of the fraud; if such facts are proved as will be equivalent to constructive notice, the result must be the same. We find a very satisfactory illustration of the rule, in what is required from the purchaser of real estate in order to perfect his title. *Caveat emptor* is the rule by which he is held, but it applies only when the buyer neglects the proper precautions in the investigation of his title; does not examine the usual sources of information; and shuts his eyes upon those facts that would necessarily lead him to the knowledge of a defect in his title, or an incumbrance upon the estate. If, however, the registry of deeds, and the records of the courts are examined—if the parties in possession are interrogated, all has been done that the law requires, and the purchaser is protected.

*Sugden on Vendors*, 730, ch. 17; *Story's Eq. vol.* 1, § 400.

If we apply this doctrine to the present case, the reason and propriety of the principle we adopt as the law, are fully vindicated.

It is further contended by the plaintiffs, that the envelope or ticket, within which the checks were folded when they were presented for payment at their counter, con-

tained a list of the checks and their several amounts, and it was therefore a representation on the part of the defendants, that they were *bona fide* checks, and if so, the payment did not change the situation of the parties. We cannot so regard the evidence. The labels upon which the checks were described, contained figures only; the names of the drawers of the checks or their date, were not stated, and we cannot regard it as any thing more than the presentation of such checks for payment, imposing no more liability upon the holder, than if they were presented without any statement of their several amounts. Every person, who exhibits a check at a bank for payment, makes the same representation, whether he speaks or is silent. He asks for the proceeds as effectually, when he shows the check and does not utter a word, as if he minutely described it. We cannot assume that what was adopted by both parties as a matter of convenience only, shall impose any liability, upon either, to guarantee the genuineness of the checks.

The plaintiffs also contend that the money was paid by mistake, and the defendants cannot in good conscience retain it. The rule is admitted, that where money is paid by one party, through mutual mistake of facts, in respect of which both are mutually bound to inquire, it may be recovered back.

*Chitty on Bills*, 9th *Ed.* 425; Commercial Bank *vs.* Bank of Albany, 1 *Hill* 287, 292, 293; Bank of Commerce *vs.* Union Bank 3, *Comstock* 237.

But this doctrine involves this question, whether the parties are in mutual fault? It does not apply to that class of cases we have considered, when the bill is taken in good faith and paid to the holder by the drawee, thereby admit-

ting the genuineness of the instrument; if it could be so applied, then another rule of law, and a most salutary one, would be abrogated, "that when one of two innocent persons must suffer by the act of a third, he who has enabled such third person to occasion loss, must sustain it."

*Chitty on Bills,* 9*th Ed.* 256 ; Lickbarrow *vs.* Mason, 2 *T. R.* 70.

The principle is more fully stated by Judge Story in 10 *Wheaton* 342, already referred to. "In respect to persons equally innocent, when one is bound to know, and act upon his own knowledge, there seems to be no reason to change the loss from the former to the latter; and there is nothing unconscientious in retaining the sum received from the bank, in payment of notes, which its own acts have assumed to be genuine."

Any other view of the legal relations of the parties, would defeat the right of the purchaser of a bill to be regarded as a *bona fide* holder, and place the parties where they would be found, if they had been implicated with the original fraud.

It has been suggested, that there is a distinction between bills and checks, which takes the present case without the ordinary rule. We cannot so understand the law; for all practical purposes they are the same, governed by the same legal principles, and with some exceptions subject to the same rules. Both may pass by endorsement; (though checks generally pass by delivery ;) both are orders drawn for the payment of money, on a third person, and are a substitute in every commercial community for cash. They are so universally regarded as media of exchange, that to restrict their negotiability would seriously affect commercial confidence, and impair the facilities of business. We

cannot admit the ingenious argument of counsel, by whom the distinction has been assumed; we perceive none in any important particular upon general principles, and we find none in the books. Whenever a check has been paid by a banker, drawn upon him and which has afterwards been discovered to be a forgery, the rule applicable to bills has been universally applied to such checks.

Smith *vs.* Mercer, 6 *Taunton* 74; Hall *vs.* Fuller, 5 *B. & C.* 750; *Chitty on Bills* 429; Young *vs.* Grote, 4 *Bing* 258; Levy *vs.* U. S. Bank, 1 *Binney* 27; City Bank N. O. *vs.* Girard Bank, 10 *Louisa.* 562; Marsh et al. *vs.* Small et al. 3 *Louisa.* 402.

It is very strenuously urged, that the plaintiffs were not bound to claim the amount they had paid, until they had discovered the forgery. The check, it will be recollected, was purchased on the 14th December, paid the same day, and the defendants were not notified until the 24th, that it had been forged. The examination of the authorities already made by the Court, and the conclusion to which it has arrived, as to the position in which the plaintiffs placed themselves by the payment of the check, will preclude any further argument, as to the duty of the drawees to examine the signatures of their customers. The question, however, very properly arises, *when?* the notice should have been given, and the check returned to the defendants. It will be borne in mind, that it is in evidence, that as between these parties, all mistakes were to be corrected on the same day the checks were paid; if they were found to be defective, they were returned on that day, and all errors were rectified. This was the mutual understanding of the parties, and imposed upon both the duty of examining all checks on the day they were re-

ceived, and to communicate at once any discovery, that would affect the relations of either. Their liability to refund for checks improperly paid, was limited to the day upon which the payment was made.

If there had been no such agreement, we should hold that the claim must have been asserted, and the demand for repayment made, on the same day. Any other rule would measure the degree of diligence in giving notice, by the circumstances of the case, and that to be determined by mere discretion, or perhaps caprice.

In Wilkinson *vs*. Johnston, (3 *B*. & *C*. 428,) notice was given on the same day. In Cocks *vs*. Masterman, (9 *B*. & *C*. 902, 907,) Mr. Justice Bayley said, " But we are all of opinion, that the holder of a bill is entitled to know, on the day when it becomes due, whether it is honored or dishonored, and if he receive the money and is suffered to retain it during the whole of that day, the parties who paid it cannot recover it back."

See also Levy *vs*. Bank United States, 1 *Binney* 27 ; *Story on Bills*, § 451.

The situation of the parties would be different, where the forged notes or checks of third persons, or of other banks, had been received. Then there would have been no legal payment, as no consideration passed, and the question of notice to the party from whom they were received would be one of time only, to be determined by circumstances. This was the ground of the decision in Jones *vs*. Ryder, (5 *Taunt*. 488,) and Bruce *vs*. Bruce, *ib*. 495.

The rule is very clearly stated by Judge Parker, in Gloucester Bank *vs*. The Salem Bank, (17 *Mass*. 33.) " The party receiving such notes, must examine them as soon as he has opportunity, and return them immediately.

If he does not, he is negligent, and negligence will defeat his right of action. The principle will apply in all cases where forged notes have been received, but certainly with more strength, when the party receiving them is the one purporting to be bound to pay; for he knows better than any other, whether they are his notes or not, and if he pays them or receives them in payment, and continues silent after he has had sufficient opportunity to examine them, he should be considered as having adopted them as his own."

But it is said that the strict rule should not be applied here, because the defendants lost nothing by the delay; that the moment they purchased the check, their remedy was gone, as in all probability the forger immediately fled. The receipt of the money, it is said, did not alter the situation of the parties, or place the defendants in a better condition than they held before. This proposition is but a *petitio principii*; it involves the propriety of the rule the Court has already adopted, and might well be considered as sufficiently answered and refuted. But it may well be asked, if we should permit the inquiry, is there not a full reply to the question, in the facts of the case? Can it be said with any certainty, that if notice had been given on the same day the check was paid, the culprit might not have been secured? At any rate, the probability of his arrest would have been stronger than if the knowledge of the fraud had been postponed, and opportunity thereby given for escape; the chances of detection would certainly decrease with the delay.

We think there is no propriety in discussing the question, whether the defendants might or might not have suffered by the postponement of the notice; it is sufficient

that no notice was given. It is the settled law that " the death, bankruptcy, or known insolvency of the maker or acceptor, or his being in prison, does not constitute an excuse, to give due notice of non-acceptance or non-payment. It is no excuse, that the chance of obtaining any thing upon the remedy over was hopeless; the parties are entitled to have that remedy offered to them, if it is not, the law says they are discharged." *Chitty on Bills* 482, 483.

Some confusion has occurred in blending the case where the endorsement is forged, and that in which the name of the drawer or maker is counterfeited; and many of the elementary writers permit the notes to their text to be filled up with contradictory authorities, thereby sustaining no principle, much less describing the obvious difference that exists between cases so clearly distinguishable from each other. It is very clear, that the holder, who traces his title through a forged endorsement, cannot be protected, though he may have been paid the amount of the bill by the drawee or acceptor. A *bona fide* purchaser, even of such a bill, would acquire no right; he would be regarded as in mutual mistake with the payee, as to the genuineness of the endorsement, and be compelled to refund, if he had been paid. There can be no analogy drawn from this state of facts, to affect in any degree the relations between parties, situated like the plaintiffs and defendants in this suit.

*Chitty on Bills* 286, 430; Canal Bank *vs.* Bank of Albany, 1 *Hill* 291; Talbot *vs.* Bank of Rochester, *ib.* 295; *Story on Bills,* § 309.

We have thus considered the various questions, submitted for our consideration. · We have been relieved of

Ellis & Morton *vs.* The Ohio Life Insurance & Trust Co.

much labor by the ability and clearness, with which the counsel for both parties have stated and argued their several propositions. The case is important, not only as to the amount in controversy, but in the many very interesting principles also its decision necessarily involves. It is but just that the law should be known, and when it is known, promptly administered. There should be no doubt, where the business of the mercantile community may be so vitally affected, by ignorance of the rule, or a want of confidence in its adoption by the Court. It is our duty then to declare what the law is, and to vindicate its certainty, by adhering to its spirit and meaning.

The plaintiffs must be called and a judgment of nonsuit entered.

Fox and WALKER for plaintiffs; WORTHINGTON and MATTHEWS for defendant.

This case was taken to the General Term on error, and affirmed; vide the following page.

A motion to arrest the evidence in any case from the Jury, and to grant a *non-suit*, necessarily assumes the fact, that upon the case as presented, there can be no recovery by the plaintiffs.

There is an admission also, in such motion, that the testimony, offered by the plaintiffs, is true, and taking it as true, there is no ground to sustain the action.

If there is doubt as to the facts proved; if the credibility of witnesses is called in question; if there is a dispute as to any material part of the testimony, a Jury is the proper tribunal to decide the controversy.

But where, as upon demurrer to evidence, all the matters in evidence are held to be fully proved, and the only real question can be the application of the law to those facts, it is not only within the power, but it is the duty of the Court to take the responsibility, and direct or refuse a non-suit as in their judgment shall be right and proper.